IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30983-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MARISA MAY FUENTES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

KORSMO, C.J. — Marisa Fuentes challenges the trial court's suppression rulings

arising from an investigative stop. We conclude that the officers had articulable

suspicion to justify the stop and affirm.

FACTS

This case has its genesis in a November 2010 investigation by the Kennewick

Police Department. Officers performed a series of controlled drug buys at an apartment

occupied by Richard Fenton. These dealings led to a search warrant and the recovery of

illegal drugs and drug paraphernalia from the apartment. Almost a year later, officers

knew that Richard Fenton was still at the apartment and also suspected that other wanted

individuals frequented the apartment. Based on this information, officers set up a stakeout outside.

On the night of the stakeout—October 5-6, 2011—officers first observed two people outside the apartment. When the officers approached the people to ask if any of the wanted individuals were present, the two ran inside and would not answer the door. Later during the stakeout, officers observed 8 to 10 people come and go from the apartment between 10 p.m. and 12 a.m. All of these people stayed between 5 and 20 minutes. It was also a weeknight. In the officers' training and experience, this activity was consistent with illegal drug dealing.

Just after midnight, officers observed a woman, later identified as Marisa Fuentes, arrive at the apartment. Within five minutes of entering the residence, Ms. Fuentes returned to her vehicle. She then retrieved from the trunk of her car a white grocery bag with unidentified contents about the size of a small football. She then took the bag into the apartment and left within another five minutes. When Ms. Fuentes left the apartment, the bag was noticeably emptier. Suspecting that she had just delivered illegal drugs, the stakeout officers radioed for supporting officers to stop Ms. Fuentes on suspicion of delivery of a controlled substance.

Officers stopped the car and advised Ms. Fuentes of her *Miranda*[1] rights. She waived those rights and the officers proceeded to question her. In the course of questioning, Ms. Fuentes admitted that she had just delivered marijuana to Mr. Fenton's apartment. Based on this information, officers were able to obtain a search warrant for both Ms. Fuentes's car and Mr. Fenton's apartment. The search of the apartment yielded methamphetamine, marijuana, and other illicit substances. The vehicle search yielded methamphetamine.

Ms. Fuentes was charged with delivery of marijuana to the apartment; no charges were filed related to the methamphetamine found in the car.[2] Ms. Fuentes moved to suppress the evidence derived from the investigative stop of her vehicle, including her admission to delivering marijuana. The trial court ruled that officers made a valid stop of the vehicle. Ms. Fuentes then was convicted of delivering marijuana at a stipulated facts trial. She timely appealed to this court.

## ANALYSIS

The sole issue in this appeal concerns whether officers had reasonable suspicion to stop Ms. Fuentes as she drove away from the apartment. We agree with the trial court that the officers had articulable suspicion justifying the stop.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[2] The methamphetamine was found in her purse, which was found in the white bag she had placed in the trunk.

3

A finding of reasonable suspicion presents a question of law that this court reviews de novo. *State v. Johnson*, 128 Wn.2d 431, 443, 909 P.2d 293 (1996). In reviewing the denial of a suppression motion, conclusions of law are reviewed de novo and the findings of fact used to support those conclusions are reviewed for substantial evidence. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Because Ms. Fuentes only challenges whether the uncontested facts were legally sufficient to give rise to reasonable suspicion, our review is de novo.

In the context of a *Terry*[3] stop, "'[t]he reasonableness of the officer's suspicion is determined by the totality of the circumstances known to the officer at the inception of the stop.'" *State v. Lee*, 147 Wn. App. 912, 917, 199 P.3d 445 (2008) (quoting *State v. Rowe*, 63 Wn. App. 750, 753, 822 P.2d 290 (1991)). We have noted that "the suspicion must be individualized." *State v. Richardson*, 64 Wn. App. 693, 697, 825 P.2d 754 (1992). Thus, if officers "have nothing to *independently* connect such person to illegal activity, a search of the person is invalid under article I, section 7 [of the Washington State Constitution]." *State v. Parker*, 139 Wn.2d 486, 498, 987 P.2d 73 (1999). Where a suspect's activity is consistent with both criminal and noncriminal activity, officers may still justify a brief detention under *Terry* without first ruling out all possibilities of

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

innocent behavior. *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986); *State v. Anderson*, 51 Wn. App. 775, 780, 755 P.2d 191 (1988).

In challenging the *Terry* stop, Ms. Fuentes chiefly relies on two cases: *Richardson* and *State v. Doughty*, 170 Wn.2d 57, 239 P.3d 573 (2010).

In *Richardson*, Yakima officers were patrolling an area late at night known for high drug activity. *Richardson*, 64 Wn. App. at 694. Multiple times throughout the course of the night, officers observed a man standing on a corner who would then approach cars and talk to their occupants. The man would then disappear and reappear at the same corner a little bit later. When officers would approach the man, he would walk away, disappear out of view, and later show back up at the corner. Based on their training and experience, the officers believed the man's activity was consistent with drug dealing. *Id*. at 694-95. When the man showed up again later, this time with another person—Richardson—officers stopped the two and detained them on suspicion of drug dealing. A search revealed that they were both in possession of illegal drugs. *Id*. at 695. This court ultimately reversed Richardson's conviction because the officers had no individualized evidence that he was involved in drug-related activity. *Id*. at 697-98. Although Richardson was seen with a person reasonably suspected[4] of drug-related activity, "an individual's mere proximity to others independently suspected of criminal

---

[4] Although dicta, this court opined that officers had reasonable suspicion to detain the man on the corner. *Richardson*, 64 Wn. App. at 697.

activity justify an investigative stop; the suspicion must be individualized." *Id.* at 697

(citing *State v. Thompson*, 93 Wn.2d 838, 841, 613 P.2d 525 (1980)).

In *Doughty*, the appellant similar to here showed up to a suspected drug house late

at night, stood there for two minutes, and then drove away. Officers then seized Mr.

Doughty and found methamphetamine in his car. *Doughty*, 170 Wn.2d at 59-60. The

Supreme Court reversed the conviction because the officers did not observe Mr. Doughty

enter the house or observe anyone come to the door and interact with him. *Id.* at 64. The

court also noted that Doughty was not seen carrying any unusual objects or otherwise

acting suspiciously. *Id.* at 65.

While some parallels can be drawn from *Richardson* and *Doughty* to this case, the

officers in this case had more information on which to base their suspicions than in those

cases. In *Richardson* and *Doughty*, officers did not see the defendant actually interact

with the other suspected party. Here, Ms. Fuentes showed up with a suspicious package

from her trunk and left with the same package noticeably lighter. In *Doughty*, officers

only had complaints that the house was a drug house. *Doughty*, 170 Wn.2d at 60. Here,

officers knew that the apartment had been and currently appeared to be used for drug

dealing. In *Doughty*, officers also did not see Mr. Doughty go inside or see anyone else

acting suspiciously. Here, officers saw Ms. Fuentes enter and exit twice within minutes

and also observed 8 to 10 other people do the same earlier in the night. In the officers'

training and experience, large numbers of people do not show up one at a time late at

6

night on a weeknight and stay for only minutes unless illegal activity is occurring. While such activity may in some circumstances be consistent with some noncriminal activities, the Constitution does not require officers to rule out all possibility of innocent behavior before making a brief investigatory stop. *Anderson*, 51 Wn. App. at 780; *Kennedy*, 107 Wn.2d at 6.

The more apt analogy is to *Kennedy*. There, officers were investigating a house suspected of being used for drug dealing based on complaints by neighbors that there was heavy traffic in and out of the house by people who stayed only minutes. *Kennedy*, 107 Wn.2d at 3. One of the people that officers observed leave the house was Mr. Kennedy. Officers did not see Kennedy enter or leave with any objects or see him otherwise acting suspiciously, but stopped him anyway after observing him leave the house. *Id.* The one substantial difference between that case and this one is that officers had a tip from an informant that Mr. Kennedy regularly purchased marijuana from the residence he was observed leaving. *Id.*

While an informant's tip is strong evidence supporting reasonable suspicion, nothing in the *Kennedy* opinion states or suggests that an informant's tip is an absolute minimum for establishing reasonable suspicion. Indeed, *Kennedy* noted that no such rule is possible, or even desirable: "'no single rule can be fashioned to meet every conceivable confrontation between the police and citizen. Evaluating the reasonableness of the police action and the extent of the intrusion, each case must be considered in light

7

of the particular circumstances facing the law enforcement officer.'" *Kennedy*, 107 Wn.2d at 7 (quoting *State v. Lesnick*, 84 Wn.2d 940, 944, 530 P.2d 243 (1975)).

Looking at the facts of this case in light of the particular circumstances facing officers, we find that the additional facts separating this case from *Richardson* and *Doughty* sufficed to give officers individualized suspicion that Ms. Fuentes had just been involved in the drug dealing that was known to take place at Mr. Fenton's apartment. Unlike those cases, she was seen carrying a bag into the apartment and came out carrying something different in the bag. Unlike those cases, here, the officers' suspicion that Mr. Fenton's apartment was a place of drug dealing was especially well founded, based on the search conducted a year earlier. She also went to the apartment after two hours of surveillance revealed that apparent drug activity was taking place there that very evening shortly before her arrival at midnight on a weekday. It was reasonable to infer that she had arrived to help resupply Mr. Fenton and/or would have information about his activities that evening.

There was articulable suspicion as well as individualized suspicion of Ms. Fuentes. The trial court correctly denied the motion to suppress.

8

No. 30983-5-III
*State v. Fuentes*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Korsmo, C.J.

WE CONCUR:

Brown, J.

Siddoway, J.

9